CARLTON, J.,
 

 for the Court:
 

 ¶ 1. Aspired Custom Homes, LLC (Aspired) appeals the Lee County Chancery Court’s judgment in favor of Tom and Tina Melton (Meltons). Aspired claims that the chancellor erred: by refusing to order specific performance of Aspired’s real-estate contract with the Meltons; entering a final judgment in favor of the Meltons; and making numerous manifestly wrong or clearly erroneous findings. Finding no error, we affirm the chancellor’s judgment.
 

 FACTS
 

 ¶ 2. The Meltons entered into a contract to purchase a home from Randall Godwin, the owner of Aspired. The contract, executed on June 25, 2008, listed the sale price of the home at $340,000, and the
 
 *543
 
 contract required the Meltons to provide earnest money in the amount of $8,000. The contract listed the closing date as July 9, 2008. The contract also stated that “the property must appraise at or above sales price or Buyers shall not be obligated to complete the purchase of the property described herein and all earnest money shall be refunded to the Buyers.” The contract required Aspired to make a substantial number of changes and additions to the home, and the contract also required the Meltons to apply in proper form for a loan sufficient to close within seven days after the effective date of the contract. The contract also provided that “[s]pecific performance is the essence of this [c]ontract.”
 

 ¶ 3. The Meltons contracted with E.C. Neelly IV to perform an appraisal and home inspection of the property. Neelly performed the appraisal six days after the execution of the contract, and Neelly subsequently generated the full report on July 1, 2008, listing the market value of the property at only $330,000. Neelly also performed the home inspection on July 1, 2008, and the home-inspection report set forth his concerns regarding the property.
 

 ¶ 4. On July 7 and 8, 2008, the Meltons sent two letters to Aspired to place Aspired on notice that the home inspection revealed standing water and flooding in the front yard. The Meltons also informed Aspired that the property appraised at a value below the purchase price. The Mel-tons informed Aspired of their desire to cancel the contract, and they demanded the return of all of their earnest money due to the standing water and flooding in the front yard.
 

 ¶ 5. Then, on July 7, 2008, Aspired sent the Meltons a letter apologizing for the yard flooding, and the letter from Aspired claimed a lack of awareness of the flooding issues. In the letter, Aspired stated that it would attempt to rectify the situation as soon as possible. According to the testimony presented at trial, these three letters passed each other in the mail or by facsimile. Aspired refused to return the earnest money to the Meltons.
 

 ¶ 6. On August 13, 2008, Aspired’s real estate agent, Crye-Leike Realty, filed in the Lee County Chancery Court a complaint in interpleader for the earnest money, and Crye-Leike Realty requested that the chancery court continue the action on its merits between Aspired and the Mel-tons. Crye-Leike also requested discharge by the chancery court from any further liability.
 

 ¶ 7. On October 2, 2008, Aspired filed its cross-claim against the Meltons in the chancery court, seeking specific performance of the real-estate contract and damages caused by the Meltons’ failure to perform. On October 27, 2008, the chancellor dismissed Crye-Leike as a party through an agreed order. On October 10, 2008, the Meltons filed their cross-claim against Aspired, seeking the return of their earnest money and attorney’s fees.
 

 ¶ 8. After a trial held on July 2, 2009, the chancellor issued his judgment on September 24, 2009, and he denied Aspired’s claim for specific performance and damages. The chancellor also declared the real-estate contract between Aspired and the Meltons to be null and void, and the chancellor ordered the earnest money to be returned to the Meltons. The chancellor ultimately ordered Aspired to pay the Meltons’ attorney’s fees and costs in the amount of $6,554.56.
 

 ¶ 9. Aspired filed a motion for reconsideration, and the chancellor held hearings on this motion on January 19, 2010, and also on February 5, 2010. The chancellor subsequently denied Aspired’s motion for reconsideration. Aspired now appeals, and it asks this Court to reverse the chan
 
 *544
 
 cellor’s opinion and judgment and order the Meltons to specifically perform the contract and pay damages to Aspired. Upon our review of the record, we concur in the chancellor’s determination that the contract between the Meltons and Aspired was null and void. We also affirm the chancellor’s order to return the earnest money to the Meltons and to pay the Mel-tons’ attorney’s fees and costs.
 

 STANDARD OF REVIEW
 

 ¶ 10. This Court “will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous[,] or applied an erroneous legal standard.”
 
 Gandy v. Estate of Ford,
 
 17 So.3d 189, 192 (¶6) (Miss.Ct.App.2009) (quotation omitted). “The existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury or a judge in a bench-trial.”
 
 Id.
 
 However, “the construction of a contract is a question of law that is committed to the court instead of a question of fact committed to the fact-finder.”
 
 Id.
 
 at 192-93 (¶ 6) (citation omitted). We review questions of law de novo.
 
 Id.
 
 In this case, Aspired’s notice of appeal reflects an appeal from the judgment of the chancery court, questioning the substance of the judgment. A judgment by the chancellor is final in all respects, thus ending the controversy with no future questions to determine, except for perhaps collateral or separate questions.
 
 City of Jackson v. Jackson Oaks Ltd. P’ship,
 
 792 So.2d 983, 985 (¶5) (Miss.2001) (citation omitted). A judgment may be subject to correction or amendment, but such corrections fail to affect its finality.
 
 Id.
 

 ¶ 11. While Aspired appeals the judgment of the chancery court questioning the judgment’s substance, we acknowledge the record reflects the chancellor denied a timely filed post-trial motion brought by Aspired pursuant to Rule 59(e) — a motion to alter or amend judgment.
 
 See
 
 M.R.C.P. 59. Aspired filed a motion pursuant to Rule 59(e) and raised four issues before the chancellor. However, a party is not required to file a post-trial motion in chancery court in order to appeal the chancery court’s judgment. We therefore address the merits of the appeal before us, questioning the substance of the chancellor’s judgment.
 
 [1]
 

 DISCUSSION
 

 ¶ 12. In his opinion and judgment entered on September 24, 2009, the chancellor stated:
 

 Prior to the closing date, [Aspired] had secured a line of credit from Merchants and Farmers Bank which put the
 
 *545
 
 value at Three Hundred Thirty-Five Thousand Dollars ($335,000.00) as reflected in Exhibit 11, which was less than the sales price. Prior to the closing date, [Aspired] had no other appraised valuation[,] but [it] estimated that the home was worth Three Hundred Sixty-Eight Thousand Dollars ($368,000.00). The [Meltons] secured an appraisal from E.C. Neelly, IV, an experienced licensed appraiser, who, on July 1, 2008, both inspected and appraised the home for Three Hundred Thirty Thousand Dollars ($330,000.00), less than the sales price, as reflected in Exhibits 1 and 9. Subsequent to the failure to close on July 9, 2008, [Aspired] had two (2) appraisals done of the house, one by Jimmy Langley, licensed appraiser, of July 30, 2008, appraising it at Three Hundred Fifty-Two Thousand Dollars ($352,000.00) and one by Mike Guyton, licensed appraiser, of July 15, 2008, appraising it at Three Hundred Fifty-Eight Thousand Dollars ($358,000.00). Nothing prevented [Aspired] from securing such appraisals before the agree-upon closing date of July 9, 2008. Prior to the time of both of those, the [Mel-tons] had given written notice to [Aspired] that the Contract was null and void, as the sales price had not been met, and that the house had not been completed as of the day they inspected it on July 4, 2008, a date with torrential rains and water standing in the yard, which required considerable work by [Aspired] to rectify, which in great part was done after July 9, 2008.
 

 Much argument was made of the fact that the appraisal of E.C. Neelly, IV, as set forth in Exhibit 1 did not initially have the correct square footage and was based upon calculations from his computer, which was not operating properly; however, this was cured as reflected in Exhibit 9 which did not change the appraisal value whatsoever. The subsequent appraisals of Jimmy Langley and Mike Guyton, which were requested and conducted subsequent to the agreed closing date, have proven to be unreliable because the house has yet to sell for anything approaching those values more than a year later. The evidence was insufficient to establish fraud or collusion on the part of the [Meltons] with Neelly.
 

 The testimony was clear and convincing that though the house was mostly complete, it was not complete on July 4, 2008, or on July 9, 2008, the closing date, and even as late as August 2008, the house was only 95 to 98% complete. To the date of trial, the house had still not been sold, even for a reduced price, but primarily because of declining market conditions.
 

 The Addendum, which is part of Exhibit 7, is part of the Contract that the parties entered into; the [Meltons] had a contractual and lawful right to terminate the Contract because the appraised value was not that of the Contract sales price as of the closing date, and that, in and of itself, was sufficient to cancel the Contract, which they did. Additionally, the house was not complete as was required by July 9, 2008, and that is an additional ground for declaring the Contract null and void, which the [Meltons] did.
 

 There was Eight Thousand Dollars ($8,000.00) placed in escrow as earnest money for the Contract, which pursuant to the terms and provisions of the Contract should be reimbursed to the [Mel-tons], as well as, under the terms of the Contract, reasonable attorney’s fees and costs.
 

 ¶ 13. On appeal, Aspired asserts that the Meltons failed to come into court with “clean hands” by breaching the implied
 
 *546
 
 covenant of good faith and fair dealing and also by failing to fulfill a number of their contractual obligations.
 
 See Cook v. Whiddon,
 
 866 So.2d 494, 498 (¶ 13) (Miss.Ct.App.2004) (citing
 
 Thigpen v. Kennedy,
 
 238 So.2d 744, 746 (Miss.1970) (The clean-hands doctrine provides that “[h]e who comes into equity must come with clean hands.”)). Aspired argues that the Mel-tons breached the implied covenant of good faith and fair dealing by failing to obtain a realistic value of the property through a proper appraisal. Aspired claims that Neelly’s appraisal was “fraught with error,” and Aspired submits that Neelly admitted at trial that he mis-meas-ured the property by thirty square feet when performing the appraisal on the property at issue. Aspired asserts that at trial, Neelly admitted that he had used a software program that contained a glitch while performing his appraisal, thereby causing errors in his report. Aspired also claims that Neelly based his appraisal on the condition of the property as appearing at the time of his inspection on July 1, 2008. Aspired argues that Neelly failed to consider any of the numerous changes or additions, which had not been completed as of July 1, but which were yet to be completed pursuant to the “Buyer’s Counter Offer # 1” addendum to the contract.
 

 ¶ 14. However, in reviewing Aspired’s claim of error in the appraisal, the record reflects that in performing the appraisal, Neelly, a state-certified real-estate appraiser,
 
 [2]
 
 utilized a market-value approach for appraising the property. As Neelly explained through his testimony, the market-value approach includes no measure of the garage area
 
 [3]
 
 or porch area. Neelly also testified that he eventually re-measured the property at the request of Aspired’s realtor, and as a result, he found a thirty-foot discrepancy from his original measurements. However, Neelly testified that this discrepancy warranted no adjustment to the appraisal amount.
 

 ¶ 15. Regarding Aspired’s claim of breach of the covenant of good faith and fair dealing, Aspired cites as error the Meltons’ refusal to allow Neelly to reevaluate his appraisal. Aspired claims that the Meltons’ refusal to allow such reevaluation constitutes a failure by the Mel-tons to refrain from actions hindering Aspired’s right to receive the benefits of the real-estate contract.
 
 [4]
 
 Moreover, Aspired argues that such refusal to allow a reevaluation constitutes a breach of good faith
 
 [5]
 
 and fair dealing by the Meltons. The Meltons, in response, assert that Aspired failed to raise this issue before the chancellor; thus, Aspired may not raise such issue for the first time on appeal. Aspired argues that its claims regarding the breach of the covenant of good faith and fair dealing with respect to the appraisal and home inspection merely consti
 
 *547
 
 tute new arguments to the issues raised and litigated previously in the chancery court. Nonetheless, the testimony and evidence in the record before us show that the Meltons hired a licensed appraiser to appraise the property in question. Neelly even proceeded to re-measure the house at Aspired’s real-estate agent’s request, and Neelly testified that the thirty-square-foot difference in the original measurement failed to impact the appraisal amount.
 

 ¶ 16. Aspired also claims that the Mel-tons breached the implied covenant of good faith with regard to the home inspection. According to Aspired, the home-inspection addendum to the real-estate contract at issue required the Meltons to both arrange for a home inspection to be conducted and also arrange for “a written request for repairs delivered” to Aspired within ten calendar days of the execution of the contract. Although Aspired agrees that the Meltons did obtain a home inspection on July 1, 2008, Aspired points out that the Meltons obtained the home inspection from Neelly, who also performed the appraisal. The Meltons cancelled the contract with Aspired after the results revealed that the home failed to meet inspection standards. However, Aspired claims that nowhere in the home-inspection report does the report state that the home was not up to standard; instead, Aspired submits that the report indicates that the home was in good condition and that only minor repairs were recommended. Aspired further contends that the Meltons complained about the various minor repairs, yet the Meltons refused to give Aspired the opportunity to make the repairs recommended in the home-inspection report. Aspired argues that the Meltons refused Aspired the opportunity to make repairs despite the requirement in the contract that the Meltons deliver a written request for repairs to Aspired within ten calendar days of the contract.
 

 ¶ 17. However, upon review of the sales contract, we find that the home-inspection addendum provides the Buyer with the discretion to choose to notify the Seller of deficiencies, as follows:
 

 [I]f deficiencies are revealed by the home[-]inspeetion report that have not been previously disclosed, buyer may:
 

 a) identify such deficiencies in writing to the Seller along with a copy of the home inspection report to the Seller. Seller will have three days to consent in writing to correct deficiencies on Buyer’s list, in an amount not to exceed $
 
 to be determined.
 
 Should correction of deficiencies cost more than the predetermined expense limitation, Sellers may elect to correct the deficiencies and proceed with the Contract; OR [the] Buyer may[;]
 

 b) accept responsibility for the correction of deficiencies and proceed to closing if Seller(s) elects not to correct deficiencies in excess of the expense limitation; OR [the] Buyer may[;]
 

 c) cancel the Contract; citing the deficiencies in writing that underlie Buyers) cancellation whereupon all earnest[-]money deposit shall be returned to the Buyer.
 

 The record reflects that the Meltons chose option (c), and the Meltons notified Aspired through a written letter of their exercise of the option to cancel the contract. The contract contains no obligation on the part of the Buyer to allow the Seller a “right to cure.” Aspired nonetheless disagrees with this interpretation of the contract, arguing that such an interpretation violates the principles of contract construction. Aspired asserts that it should be allowed to cure the deficiencies found in the home inspection.
 

 ¶ 18. We find that the addendum to the contract provided an option for the
 
 *548
 
 Meltons to cancel the contract upon the revelation by the home-inspection report of previously unknown or undisclosed deficiencies. The record reflects that the Mel-tons chose to exercise this option to cancel the contract. Upon review, we find that evidence in the record supports the chancellor’s finding that the contract is void; therefore, the record fails to support the claims of breach of covenant of good faith and fair dealing asserted by Aspired. This Court has previously recognized that the terms
 
 [6]
 
 in an addendum to a real-estate contract give parties the right to render the contract null and void if the home-inspection results were not acceptable.
 
 See Williams v. Estate of Morrison ex rel. Morrison,
 
 969 So.2d 132, 133, 135 (¶¶2, 9) (Miss.Ct.App.2007).
 

 ¶ 19. Aspired next claims that: the Meltons did not “make application in proper form” for a loan sufficient to close on the house within seven days of the contract, and also the Meltons failed to apply for a loan as late as July 4, 2008. After reviewing the record, we find no evidence of fraud or willful misconduct on the part of the Meltons. The record instead reflects substantial evidence showing that the Meltons exercised their rights under the contract to cancel the agreement prior to the closing date. Tina testified that she had spoken to various lenders
 
 [7]
 
 about securing a loan, and she informed the chancellor that her father may also loan them the money for the house. The Meltons’ agent, Frances Dempsey, testified that she showed no other houses to the Meltons between June 20 and July 8, 2008. Both Dempsey and Tina testified that the Meltons were not looking at other houses prior to the cancellation of the contract. The testimony and evidence presented at trial also supports the chancellor’s finding that the “evidence was insufficient to establish fraud or collusion on the part of the [Meltons] with Neelly.”
 

 ¶ 20. Aspired also argues that the chancellor erred when he refused to order the Meltons to specifically perform the real-estate contract. We acknowledge that this Court “has considered specific performance as a ‘particularly appropriate remedy’ in matters pertaining to a breach of a real-estate contract, because of real estate’s unique nature.”
 
 Houston v. Willis,
 
 24 So.3d 412, 418 (¶ 19) (Miss.Ct.App.2009) (citations omitted). Additionally, we note that specific performance has been regarded as a remedy for breach of contract but not a remedy of right.
 
 Id.
 
 The remedy of specific performance falls within sound judicial discretion, but “[j]udicial discretion notwithstanding, where a contracting party can feasibly be given what he bargained for, specific performance is the preferred remedy.”
 
 Id.
 
 However, in this case, the addendum to the contract provided the Meltons with the option to cancel the contract due to deficiencies revealed by the home inspection report. Therefore, no breach of contract occurred herein, and no basis exists to consider specific performance as a remedy in the
 
 *549
 
 present case. Thus, we find no error in the chancellor’s denial of Aspired’s request for specific performance of the contract. We also find no error in the chancellor’s declaration of the contract as null and void.
 

 ¶ 21. In addition to the claims of breach of the covenant of good faith and fair dealing and specific performance, Aspired also claims that numerous factual findings by the chancellor were manifestly wrong or clearly erroneous. Aspired specifically asserts the following findings as error: nothing prevented Aspired from securing appraisals before the July 9, 2008 closing date; a basis for the Meltons’ attempt to cancel the contract was lack of completion of the house as of July 4, 2008, the date the Meltons inspected the home; rectifying a drainage issue required considerable work; the appraisals of Langley and Guy-ton were unreliable; and the failure to complete the house 100% as of July 9, 2008, constituted an additional reason for declaring the contract null and void. This Court will not set aside a chancellor’s findings of fact or disturb such findings on appeal unless the findings are manifestly wrong or clearly erroneous.
 
 Patterson v. Trustmark Nat’l Bank,
 
 918 So.2d 792, 794 (¶ 9) (Miss.Ct.App.2005). Additionally, we require a chancellor’s findings to be supported by substantial credible evidence.
 
 Id.
 
 We will now turn to apply this standard of review to the numerous errors of factual findings raised by Aspired.
 

 ¶ 22. Regarding Aspired’s assertion that the chancellor erred in finding that nothing prevented Aspired from securing appraisals before the closing date, Aspired asserts that the Meltons provided notice on July 8, 2008, one day prior to the scheduled July 9, 2008 closing date, of the Meltons’ desire to cancel the contract due to the property not appraising for the purchase price. Aspired argues a lack of ability and impossibility to obtain another appraisal in just one day. However, Aspired notes that it did obtain an appraisal from Guyton less than one week later, on July 15, 2008, and then it obtained a second appraisal from Langley on July 30, 2008.
 
 [8]
 
 However, we find no error with the chancellor’s findings on this issue. The record reflects no evidence that Aspired lacked the ability to secure an appraisal at any time during the contract negotiations. The record supports the chancellor’s finding that no contract or other hindrance prevented Aspired from obtaining an appraisal on its own, instead of waiting until the Meltons’ presentation of an unsatisfactory appraisal value.
 

 ¶ 23. Aspired next asserts error in the chancellor’s finding that a basis for the Meltons’ attempt to cancel the contract was due to the house not being completed as of July 4, 2008, the date the Meltons had inspected the home. Aspired claims that no evidence in the record supports that the Meltons based their cancellation of the contract upon a claim of failure to complete the house as of July 4. Instead, Aspired cites to Tina’s testimony that she and her husband chose not to proceed to closing due to the appraisal amount falling under the agreed purchase price and the home not meeting the standard requirements. In support of this argument, Aspired points to the Meltons’ written notice to cancel the contract, wherein the Meltons cite standing water in the front yard and the appraisal amount as the two reasons for not proceeding with the closing.
 

 
 *550
 
 ¶ 24. Aspired also argues that the chancellor erred in finding that the house failed to be 100% complete on the July 9, 2008 closing date. Although Aspired acknowledges that the new door the Meltons ordered had not been delivered, Aspired states that the testimony in the record supports the fact that the house was substantially complete. Our review of the trial transcript, however, shows that Tina testified regarding the state of the house as of July 4, 2008, explaining:
 

 [The][e]xterior doors were not painted. The front door was not changed out. The transom, I believe, was changed out. The four columns were not changed out to the specifications on this. They were supposed to be cypress and they were not. They were just cased in. They were, like, one by six’s that were just taken and nailed together and cased in. The gutters were being put up, but they were not completed. The repainting and sanding, I’m reading the list, they had begun that, but that was not completed. The professional cleaning was not completed. The lights that were to be installed were not even purchased. They were not done. Cabinet lights were not put up. The cabinetry in the kitchen was just completely not finished. There were shelves missing, there were doors missing, knobs missing, drawers missing, glass cabinets that should have glass shelving, that was missing, none of that was completed. Glazing of both fireplaces was not completed. The shoe molding around the cabinets and all of that was not completed. The tile around the fireplace looked like they had been started [sic] to work on that. That was not completed. The ceiling was not completed. The water leak was not completed. I believe there had been some work done to the storage room, as far as it looked like they had taken out some sheet rock or something and had started working back on that. That was not completed. There was an extra water heater, but it was not hooked up. The plywood had not been added to the attic.
 

 Additionally, Jason Roberts, the real-estate appraiser for Jimmy Langley Appraisal, also testified that the house lacked completion upon his inspection on August 14, 2008. Thus, sufficient evidence exists in the record to support the chancellor’s finding that the house was not 100% complete at the time of closing.
 

 ¶ 25. The chancellor’s judgment provides that the Meltons gave written notice to Aspired that the contract was null and void, explaining that:
 

 [T]he sales price had not been met, and ... the house had not been completed as of the day they inspected it on July 4, 2008, a date with torrential rains and water standing in the yard, which required considerable work by [Aspired] to rectify, which in great part was done after July 9, 2008.
 

 The chancellor also stated that:
 

 [T]he [Meltons] had a contractual and lawful right to terminate the Contract because the appraised value was not that of the Contract sales price as of the closing date, and that, in and of itself, was sufficient to cancel the Contract, which they did. Additionally, the house was not complete as was required by July 9, 2008, and that is an additional ground for declaring the Contract null and void, which the [Meltons] did.
 

 Although testimony at trial supported the chancellor’s finding that the house lacked completion on July 4, 2008, the Meltons’ letter to Aspired fails to state that the incompletion of the house constituted a reason for cancelling the contract by the Meltons. However, we do not find that the chancellor’s findings are clearly erro
 
 *551
 
 neous, as the Meltons presented testimony that the house was indeed incomplete at the time of closing. The chancellor’s description of incompleteness reflects a con-clusory summary of the testimony as to the condition of the property relative to the parties’ respective rights under the contract. Additionally, the chancellor explained that the Meltons already possessed a lawful right to terminate the contract due to the appraisal falling below the sales price.
 
 See Murphy v. Murphy,
 
 631 So.2d 812, 815 (Miss.1994) (An appellate court will not disturb a chancellor’s findings when the findings are supported by substantial evidence.).
 

 ¶ 26. Aspired claims that neither evidence nor testimony at trial supports the chancellor’s finding that correction of the deficiency as to standing water required considerable work by Aspired. Aspired submits that the repair work required approximately two or three days to complete. However, the record supports the chancellor’s findings, and it reflects that Randall Godwin, a contractor for Aspired, testified that correction of the standing water required placement of pipes under the sidewalk of the house; digging up the end of the driveway; and installation of a new drainage pipe underneath the driveway. Godwin testified that the repair work for the drainage issue was not completed before July 9, 2008.
 

 ¶ 27. Aspired also submits that no evidence exists to support the chancellor’s findings that the appraisals performed by Langley and Guyton lacked reliability. Aspired asserts that the chancellor based his finding solely on the fact that the house at issue had yet to sell. Aspired submits that the chancellor erred in failing to examine other factors, such as the economy and the housing market, when making a finding as to the failure of the house to sell by the time of trial. We acknowledge that despite Aspired’s assertions to the contrary, the chancellor’s September 24, 2009 opinion clearly.states that “to the date of trial, the house had still not been sold, even for a reduced price, but primarily because of declining marketing conditions.”
 

 ¶ 28. Aspired finally claims that the chancellor’s award of attorney’s fees cannot stand on appeal. However, since we have found no merit to Aspired’s claims that the chancellor committed error in his findings, and since the contract between the parties authorizes the award of attorney’s fees to the prevailing party in the event of litigation, the chancellor’s award of attorney’s fees and costs in the amount of $6,554.56 will stand.
 
 See Hamilton v. Hopkins,
 
 834 So.2d 695, 700 (¶ 16) (Miss.2003) (Recognizing that parties may contractually provide that in the event of a dispute, the losing party will be charged with paying attorney’s fees.). The real-estate contract at issue states that “[i]f it becomes necessary to ensure the performance of this Contract for either party to initiate litigation, then the non-prevailing party agrees to pay reasonable attorney[’s] fees and court costs in connection therewith to the prevailing party.” This Court has held that “enforcing a contract ‘without enforcing the clause addressing attorney's] fees would be contrary to the law.”
 
 Indus. and Mech. Contractors of Memphis, Inc. v. Tim Mote Plumbing, LLC,
 
 962 So.2d 632, 638 (¶ 19) (Miss.Ct.App.2007) (quoting
 
 Theobald v. Nosser,
 
 752 So.2d 1036, 1042 (¶24) (Miss.1999)). Accordingly, we affirm the chancellor’s ruling that Aspired bears responsibility for paying the Meltons’ attorney fees and costs.
 

 ¶ 29. Based upon the foregoing, after a thorough review of the record and the arguments presented, we find the chancellor’s findings to be supported by substan
 
 *552
 
 tial evidence, and we affirm the chancellor’s judgment in favor of the Meltons.
 

 ¶ 30. THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, ISHEE, ROBERTS, MAXWELL AND RUSSELL, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT.
 

 [1]
 

 . If a party's motion for reconsideration is served within ten days of the rendition of judgment, the motion falls under Rule 59(e) of the Mississippi Rules of Civil Procedure.
 
 Carlisle v. Allen,
 
 40 So.3d 1252, 1260 (¶ 33) (Miss.2010) (citing
 
 Cannon v. Cannon,
 
 571 So.2d 976, 978 (Miss.1990)). The Mississippi Supreme Court has established that to succeed on a Rule 59(e) motion, “the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice.”
 
 Brooks v. Roberts,
 
 882 So.2d 229, 233 (¶ 15) (Miss.2004). Case law has also provided that "[a]n appeal from a denial of a Rule 59 motion may address the merits of the entire underlying proceeding, and review of a trial judge's denial of a Rule 59 motion is limited to abuse of discretion.”
 
 Perkins v. Perkins,
 
 787 So.2d 1256, 1261 (119) (Miss.2001). In this case, the notice of appeal reflects only an appeal by Aspired from the judgment of the chancellor, with no reference to the unsuccessful post-trial motion.
 

 [2]
 

 .
 
 See
 
 118 Am.Jur. Proof of Fact 3d 403 ¶ 12 (Appraisers owe duty of care to their clients to perform their undertaking with ordinary care and competence reasonably expected of members of the profession in their community.).
 

 [3]
 

 . Neelly explained that by utilizing the market-value approach, his analysis did not require him to take into account a 552-square-foot garage, a part of the property which he would have valued at thirty dollars per square foot.
 

 [4]
 

 . However,
 
 see Lassiter v. Bank of North Carolina,
 
 146 N.C.App. 264, 551 S.E.2d 920, 922-23 (2001), wherein the North Carolina Court of Appeals held that a lender’s property inspection is not performed for the benefit of the borrower.
 

 [5]
 

 . A breach of the implied covenant of good faith "is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness.”
 
 Entergy Miss., Inc. v. TCA Cable Partners,
 
 22 So.3d 284, 288 (¶ 13) n. 2 (Miss.Ct.App.2009).
 

 [6]
 

 .
 
 See also Mut. Benefit Health & Acc. Ass’n v. Blaylock,
 
 163 Miss. 567, 143 So. 406, 407 (1932) (“It is a familiar rule of construction of contracts ... that they are construed most strongly against the party drafting the contract, and most favorably to the policyholder.”);
 
 Cain v. Cain,
 
 967 So.2d 654, 662 (¶ 18) (Miss.Ct.App.2007) ("In determining the meaning of contract terms, this Court reads the contract as a whole, gives contract terms their plain meaning, and construes any ambiguities against the drafter.”).
 

 [7]
 

 .
 
 See
 
 78 A.L.R.3d 880 ¶¶ 2-4 (1977) (The sale of real estate contingent upon financing requires reasonable effort or reasonable diligence. Mere inquiries and discussion with lenders have been found sufficient.).
 

 [8]
 

 . Thomas Roberts, an appraiser for Jimmy Langley Appraisal, testified that due to a glitch in their appraisal program, the appraisal form listed June 30, 2008 as the date of the performance of the appraisal. However, Roberts clarified that he actually received the order for the appraisal on August 6, 2008, and he performed the appraisal on August 14, 2008.